**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| STERLING SAWYER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 09-CV-6962 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| COLUMBIA COLLEGE, et. al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Sterling Sawyer claims that he was discriminated against on the basis of his race and gender when he was terminated from his employment at Columbia College ("the College"), and suspended for one calendar year. Plaintiff brings claims against the College for race discrimination and retaliation in violation of Title VI of the Civil Rights Act of 1964, and sex discrimination in violation of Title VII. Defendant has moved for summary judgment [61]. For the reasons set forth below, the Court grants Defendant's motion for summary judgment [61].

**I.      Background**

Plaintiff, an African-American male, was a student enrolled in Columbia College in the fall semester of 2002, the fall semester of 2007, and the spring semester of 2008. During fall semester 2002, Plaintiff took four classes and received three C's and one D. Plaintiff left the College and did not return until the fall semester of 2007. Plaintiff returned to the College in September 2007, attended two fall semester classes, and received a C+ and a C in those classes. Plaintiff discussed the C+ with his professor and the grade was ultimately changed to an A-.

In approximately January 2008, Plaintiff began working for Youth Communication Chicago ("Youth Communication") as part of Defendant's work-study program.[1]  In addition to the work-study program, Plaintiff was enrolled in Introduction to Marketing and Producing Recorded Music at the College.  Plaintiff received a D in Introduction to Marketing and a C in Producing Recorded Music.  Plaintiff took issue with his Introduction to Marketing grade.  On June 18, 2008, Plaintiff e-mailed J. Dennis Rich ("Rich"), an administrator at the College, challenging the grade.  Concurrently, Plaintiff e-mailed Colleen Flanigan ("Flanigan"), his Introduction to Marketing professor, asking if there was any way for him to raise his grade. Flanigan is a white female.  In his deposition, Plaintiff testified that he "guess[ed]" Flanigan once told him "you people need to learn how to turn your work in on time."  Plaintiff believed this comment was directed at him because he was the only African-American in the class. Sawyer Dep., 94:5-95:25, 96:7-9.

On June 18, 2008, Rich responded to Plaintiff's e-mail and advised him of the steps he needed to take to appeal his grade, which were also outlined in the student handbook.  On June 20, 2008, Plaintiff e-mailed Rich and alleged that he was not given the same opportunities as other students because he was the only African-American in the class.  Rich responded to Plaintiff on June 20, 2008, advised him of the steps he needed to take to follow through on his claim and asked him to document all instances of racial discrimination that may have occurred in the class.  Rich also asked Plaintiff to send him his coursework from the Introduction to Marketing class for Rich's review.  On June 21, 2008, Plaintiff replied, but did not provide the information Rich requested; rather, Plaintiff requested a meeting to discuss the matter in person. There is no evidence in the record that Rich was ever apprised of the specific interactions

---

[1]  Defendant is considered the employer for purposes of its agreement with Youth Communication.  Ex. B, Columbia College Chicago Off-Campus Federal Work-Study Agreement ("The institution [Defendant] is considered the employer for purposes of this agreement.").

between Plaintiff and Flanigan that were discussed in Plaintiff's deposition. Furthermore, there is no evidence in the record that Plaintiff ever provided any documentation relating to the alleged discrimination.

On June 23, 2008, in the midst of his grade appeal, Plaintiff was involved in a physical altercation with a female African-American student, Ginger Bush, in the Youth Communication offices. Plaintiff testifies that Bush began arguing with Plaintiff, "smacked him in the face," threw a milkshake at him, and then continued to attack him physically. Sawyer Dep., 67:23-70:15. Plaintiff then physically "pushed [Bush] up off of [him]" and the altercation ended when Phil Costello, a white Youth Communication supervisor, intervened. Sawyer Dep., 75:10-24. Costello e-mailed a report of the incident to two Columbia College officials stating that he left his office when the argument "escalated beyond appropriate levels" and witnessed "[Plaintiff] holding back [Bush's] right hand and [Plaintiff's] right hand on [Bush's] hair." See Beverly Anderson Affidavit ("Anderson Aff."), Ex. 3. The hair pulling is corroborated by Kevin Sparrow, Youth Communication's Manager of Multimedia, who witnessed the tail end of the altercation. In an e-mail, Sparrow wrote:

> Shortly after 11:00am on June 23rd, I heard some voices being raised out in the main room from my office. The sounds quieted down until I heard a splashing sound, which was a milkshake being thrown as we later discovered the splatter on our wall, and then of chairs scuffling across the floor. I got up to check on the situation, and I saw Phil [Costello] exit his office and go directly to [Bush] and [Plaintiff]. [Plaintiff] was pulling [Bush's] hair, and [Bush] was pushing and scratching [Plaintiff's] arm. After a few seconds, [Costello] was able to separate the two.

Anderson Aff., Ex. 4. Samori Wood, an African-American Youth Communication employee, was in the room with Plaintiff and Bush throughout the entire event and described the altercation in an e-mail:

After about a minute and a half of arguing, [Plainitff] made one last comment that sent [Bush] over the edge and she slapped him on the right side of the face and took a step back. Shocked and stunned, [Plaintiff] sat in the chair and paused in disbelief for maybe five second[s]. He then got up and I as well got up. As he walked toward [Bush], I took five steps away from the scene to make sure I did not get involved in any form or fashion. While I watched from a distance, I saw [Bush] chuck her milkshake at [Plaintiff]. I assume she thought he was about to hit her.

As she threw the milkshake [Plaintiff] ducked but it still managed to graze the top of his head before it splattered against the wall. [Plaintiff] still continued to walk toward [Bush], and again she tried to slap him, but he grabbed a hold of right hand to stop her. [Bush] began to scratch him on the right side of his face and his left arm; so [Plaintiff] grabbed her by her hair as well to try to restrain her. At that time our boss Phil Costello came out from his office, walked passed me to get them to try and pull them apart. After fifteen to twenty seconds he was able to separate them.

Anderson Aff., Ex. 5.  In his deposition, Plaintiff stated that:

What happened was – well, I didn't grab her hair or – like I say, I didn't engage or try to retaliate or like the impression that you're trying to give or your interpretation of what he's [Samori Wood] saying is not what happened. I didn't grab her hair or grab her wrist or anything like that and, you know, to try to retaliate or engage or hurt her, because she smacked me. I didn't do that.

Sawyer Dep., 74:13-22.

The details of the Youth Communications incident were sent to Beverly Anderson ("Anderson"), an African-American woman and the College's Assistant Dean of Student Health and Support, for an investigation of the incident. As part of her review, Anderson reviewed documents describing two additional incidents involving Plaintiff that occurred on February 15, 2007, and August 15, 2007.

Although the exact details of the February 15, 2007 incident are in dispute, Plaintiff does not dispute that, as part of her investigation, Anderson reviewed the facts as described in the "Columbia College Incident or Discrepancy Report" that was prepared directly after the February 15 altercation. On February 15, 2007, Plaintiff was visiting the College's

4

administrative office to re-enroll for the fall semester when he ran into his then-girlfriend, Iola

Benjamin. Sawyer Dep., 21:5-25. In the Columbia College Incident or Discrepancy Report, Sgt.

Johnny Gratton coded the incident as a "Disturbance (fight)" and wrote:

> I witnessed a physical altercation between two (non current) students. Male identified as [Plaintiff] and female identified as Iola Benjamin which took place in the Hokin Gallery. I quickly intervened and escorted [Plaintiff] out of the building. I spoke with Ms. Benjamin in private to ask what happened and if she needs medical attention and her concern was that we do not kick [Plaintiff] out of school or call police.

Anderson Aff., Ex. 1. The Hokin Gallery is part of the Columbia College campus. After the

incident, Iola Benjamin gave the following statement to Columbia security:

> So I stood up and asked my friend if he was done using my phone, he said sure but my boyfriend [Plaintiff] put the phone in his pocket and said "B----, this ain't yo' phone" so I tried to pull the phone out of his pocket, he kept blocking me so I said please and kept reaching. He started threatening to "slap the s--- outta me" so I grabbed the arm of his coat to keep him from blocking me. My friend and his friend left and I guess that pissed him off cuz he stood up. When he stood up, I tried to get him to calm down and sit down when he started attacking me and security stopped him from continuing.

Anderson Aff., Ex. 1.

Plaintiff denies that the report accurately depicted the incident.[2] Plaintiff asserts that he

was in the building to re-enroll for the fall when he saw Benjamin and began speaking with her

about the state of their relationship. Sawyer Dep., 21:5-22:7. After engaging in a "normal

conversation," Benjamin "grabbed [Plaintiff's] hand" and the two were eventually separated by a

Columbia security guard. Sawyer Dep. 22:7-23:12. Plaintiff maintains that he did not physically

touch Benjamin at any time during the incident. Sawyer Dep. 22:14-16.

As part of her investigation, Anderson also reviewed e-mails and reports regarding an

incident involving Plaintiff that occurred during a Columbia-sponsored trip to New Orleans in

August of 2007. Though he was not enrolled at the College in August 2007, Plaintiff was living

---

[2] The report indicates that Benjamin and Plaintiff were not "current students" at the time of the incident.

across the street from the College at 618 S. Wabash. Sawyer Dep., 25:25-27:15. During his stay at 618 S. Wabash, Plaintiff met Kevin Caldwell, a student at the College whom Plaintiff believed had been hired to film a documentary in New Orleans. Sawyer Dep., 26:24-27:22. Caldwell invited Plaintiff to New Orleans even though Plaintiff was not enrolled in the College at the time because Plaintiff told Caldwell that he was signed up for fall classes. Sawyer Dep., 28:21-29:20. Plaintiff accepted the invitation and went to New Orleans in early August 2007, along with 30-40 other people, 10-15 of which were Columbia College students. The group included Iola Benjamin, Plaintiff's girlfriend at the time. Sawyer Dep., 30:4-22.

On August 2, 2007, Plaintiff visited New Orleans' famed Bourbon Street with a group of students and Mecca Brooks, whom Plaintiff believed to be the "director handling the operations of everything [in New Orleans]." Sawyer Dep., 32:2-4, 33:14-20. Iola Benjamin was part of the group. Sawyer Dep., 33:25-34:15. At some point during the evening, Plaintiff alleges that Benjamin "had a breakdown" and "started crying about * * * some of the homes that she seen that had got destroyed from hurricane Katrina and she was asking me why I wasn't upset about, you know, the stuff that we saw * * * and she just had a breakdown and I tried to comfort her." Sawyer Dep., 36:10-18. When asked if Benjamin was angry with Plaintiff, Plaintiff stated "yeah, she did get angry at me. She told me to leave her alone, you know, don't – 'Get away from me.' Not to touch her." Sawyer Dep., 36:20-24. Plaintiff then "walked away from her" and eventually found Caldwell, who asked if Plaintiff had gotten into a fight with Benjamin. Sawyer Dep., 38:24-39:12. Mecca Brooks, the apparent chaperone, was with Caldwell and informed Plaintiff that he could not go back to the dorm where he was supposed to stay and that he could not board the bus, implying that Plaintiff "had a fight with Iola [Benjamin]." Sawyer Dep., 41:22-42:14. Plaintiff, along with Mecca Brooks, apparently stayed the night in the FEMA

trailer of a man named Shakespeare. Sawyer Dep., 49:4-23; 50:6-10. The next morning, Plaintiff was driven to the bus station and one of the chaperones purchased his ticket back to Chicago. Sawyer Dep., 48:7-11.

Although Plaintiff does not specify exactly when this occurred, at some point during the ordeal, Plaintiff alleges that the group's tour guide, a white woman, "called [Plaintiff] a 'N-----'" and a "f----- woman beater' and threatened him by saying "how would you like it if I get some of my friends to beat you up?" Sawyer Dep., 54:8-15. Plaintiff was unclear if the tour guide worked for the College but stated that the tour guide was not on the bus and that the first time he saw her was in New Orleans. Sawyer Dep., 54:16-55:4. Further, Plaintiff alleges that Lott Hill told him that "'[t]hese black guys don't know how to conduct theirself.'" Sawyer Dep., 55:8-12. The record does not reflect with whom Lott Hill is affiliated.

On August 15, 2007, Brooks e-mailed a narrative of the incident to Kari Sommers, Columbia's Assistant Dean of Student Life. Anderson Aff., Ex. 2. Sommers forwarded the e-mail to Beverly Anderson on the same day. Brooks' description of the incident differs considerably from Plaintiff's. As Brooks described it, on August 2, 2007, Plaintiff "punched Iola Benjamin (closed fist) in the eye while we were having an evening out on Bourbon Street in the French Quarter of New Orleans." Anderson Aff., Ex. 2. Brooks did not witness the incident but was apprised of the situation by Shay Kilby, a woman that was hired to assist the group in New Orleans. Anderson Aff., Ex. 2. Brooks wrote that Kilby "witnessed Plaintiff hit Iola in the eye and immediately informed me about it." Anderson Aff., Ex. 2. Brooks further stated that she "was told by another Columbia student * * * that Iola was in Plaintiff's face and he got really annoyed and hit her. I later learned right before the incident that he had just lost his wallet with all his money and was already on edge. Not to mention the two of them were a continuous

problem the moment we left Chicago." Anderson Aff., Ex. 2. Brooks separated Benjamin and

Plaintiff after the incident and described what happened next:

> I stayed in the French Quarter trying to figure out how to get [Plaintiff] out of
> New Orleans as soon as possible. While I was there, Robert Washington—
> Saturday Scholars Office Assistant—was back at the camp packing all of
> [Plaintiff's] belongings. Shay [Kilby] really wanted me to leave [Plaintiff] in the
> French Quarter which I felt really uncomfortable with doing considering the racial
> tension in New Orleans at the present time. Instead, Shakespeare offered him a
> place to stay in his FEMA trailer until the next morning. The very next morning,
> me and one of my volunteers—Tanya Ward—took [Plaintiff] to the bus station
> where Tanya purchased a ticket for him to get back to Chicago. Iola had left on
> an early bus and was taken there by [several volunteers].

Anderson Aff., Ex. 2. The College took no disciplinary action at the time and Plaintiff was

allowed to enroll in classes for the fall 2007 semester.

After reviewing the details of the February 15, 2007 incident in the Hokin Gallery and the

August 2, 2007 incident in New Orleans (as part of her investigation into the June 23, 2008

altercation at the Youth Communications office), Anderson concluded that Plaintiff, along with

Ginger Bush, would be terminated from their positions at Youth Communication for engaging in

a physical altercation in Youth Communications offices and in front of Youth Communications

staff, Columbia students, and possibly high school students. Anderson Aff. at ¶8. Anderson also

concluded that Plaintiff would be suspended from attending Columbia for one academic year in

light of the Youth Communication incident and the incidents occurring in 2007 in New Orleans

and at the Hokin Gallery. Anderson Aff. at ¶8. Anderson informed Bush of her termination

from Youth Communications on June 24, 2008. Anderson Aff. at ¶10. On July 8, 2008,

Anderson advised Plaintiff that he was being terminated from his position at Youth

Communications and was being suspended from Columbia for the 2008-2009 academic year.

Anderson Aff. at ¶9.

Anderson advised Plaintiff that if he wanted to appeal or discuss the decision, he could arrange a meeting with her. Anderson Aff. at ¶9. Plaintiff met with Anderson and Martha Meegan, a Columbia security officer, to discuss his termination and suspension. Sawyer Dep. 84:12-85:25. Meegan is a white female. Sawyer Dep. 90:7. During his deposition, Plaintiff testified that "the way [Meegan] was speaking, her tone, you know, her eye contact and her body language" during the meeting led him to further believe that the reasons for his termination were based on his race and sex. Sawyer Dep. 89:17-91:11.

Sawyer filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") on July 31, 2008, alleging the following:

> I had been employed by Respondent as a Writing Coach/Editor, and enrolled in Columbia College's academic program since January 10, 2008. On June 23, 2008, I was verbally and physically assaulted. On July 8, 2008, I was discharged and suspended from the academic program.

> I believe I have been discriminated against because of my sex, Male, in violation of Title VII of the Civil Rights Act of 1964, as amended.

Sawyer received a notice of rights from the EEOC on August 28, 2009, in which the EEOC determined that it was unable to conclude that Sawyer's termination and suspension represented unlawful sex discrimination and informed him that he had the right to file a lawsuit within 90 days of receiving the notice.

On November 5, 2009, Sawyer filed a complaint against the College asserting a Title VII claim for employment discrimination on the basis of sex, as well as a Title VII claim for retaliation. Shortly thereafter, on November 20, 2009, Sawyer filed an amended complaint in which he added Youth Communications and Ginger Bush as Defendants and included additional claims, including (1) Title VI race discrimination and retaliation claims[3] and (2) an assault and

---

[3] The form complaint for employment discrimination used by Plaintiff does not list a Title VI claim among the available claims, as Title VI covers discrimination by institutions receiving public funds, not

battery claim against Ginger Bush. The College moved to dismiss [16] Plaintiff's amended complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). The Court granted the College's motion to dismiss with respect to Plaintiff's Title VII retaliation claim and denied the motion with respect to the Title VII sex discrimination claim, the Title VI race discrimination claim, and the Title VI retaliation claim.

## II.    Summary Judgment Standard

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette, Ind.,* 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to

---

employment discrimination. In his amended complaint, Plaintiff edited the form to read "(e) Race (Title VI * * * )" instead of "(e) Race (Title VII * * * )" and confirmed in his response brief that the edit was intentional. See [22]. As both parties agree that no Title VII race discrimination claim is at issue, the Court will not consider such a claim.

the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 252.

No heightened standard of summary judgment exists in employment discrimination cases, nor is there a separate rule of civil procedure governing summary judgment in employment cases. *Alexander v. Wisconsin Dept. of Health and Family Servs.*, 263 F.3d 673, 681 (7th Cir. 2001) (citing *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997)). However, intent and credibility frequently are critical issues in employment cases that in many instances are genuinely contestable and not appropriate for a court to decide on summary judgment. See *id.* Nevertheless, summary judgment in favor of the defendant is hardly unknown or, for that matter, rare in employment discrimination cases. *Wallace*, 103 F.3d at 1396.

## III. Analysis

Plaintiff's claims of Title VII sex discrimination, Title VI race discrimination, and Title VI retaliation in this lawsuit stem from Beverly Anderson's decision on July 8, 2008, to terminate Plaintiff from his position at Youth Communications and suspend him from Columbia College for the 2008-2009 academic year. Ms. Anderson's decision took into account the June 23, 2008 altercation at the Youth Communications office and the incidents occurring in 2007 in New Orleans and at the Hokin Gallery. Anderson Aff. at ¶ 8. The Court will address each of Plaintiff's claims in turn.

### A. Title VII Sex Discrimination

Plaintiff claims that Defendant discriminated against him on the basis of his sex in violation of Title VII of the Civil Rights Act when he was fired from his job at Youth

Communication. Title VII prohibits discrimination in employment: "It shall be an unlawful employment practice for an employer * * * to discharge any individual because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To prove a case of discrimination under Title VII, a plaintiff may show discrimination under either the "direct" or "indirect" methods of proof. *Atanus v. Perry*, 520 F.3d 662, 671-72 (7th Cir. 2008) (reiterating that the direct method may be proven with either direct or circumstantial evidence and that the indirect method proceeds under the burden-shifting rubric set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803 (1973)); see also *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007).

Under the direct method of proof, the plaintiff may introduce either direct or circumstantial evidence to create a triable issue as to whether the adverse employment action was motivated by a discriminatory intent. *Id.*; see also *Isbell v. Allstate Ins. Co.,* 418 F.3d 788, 794 (7th Cir. 2005); *Essex v. United Parcel Serv. Inc.*, 111 F.3d 1304, 1308 (7th Cir. 1997). In other words, the plaintiff must show either "an acknowledgement of discriminatory intent by the defendant or circumstantial evidence that provides the basis for an inference of intentional discrimination." *Dandy v. United Parcel Service, Inc.,* 388 F.3d 263, 272 (7th Cir. 2004) (citing *Gorence v. Eagle Foods Ctrs., Inc.,* 242 F.3d 759, 762 (7th Cir. 2001)). A plaintiff may prevail under the direct method of proof by "constructing a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decision-maker." *Jordan v. City of Gary, Ind.*, 396 F.3d 825, 832 (7th Cir. 2005) (quoting *Rhodes v. Ill. Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004)).

Plaintiff has not identified any evidence to support a claim under the direct method of proof. There are no admissions made by Columbia of discriminatory intent nor are there any

express statements made regarding Plaintiff's sex. In attempting to proceed under the direct method, Plaintiff references the conduct of Martha Meegan, a security guard at the College, during his meeting with Beverly Anderson, namely "the way [Martha Meegan] was speaking, her tone, you know, her eye-contact and her body language. It wasn't actually what she said. It was how she said it and the gestures that she said it with." Sawyer Dep., 89:17-91:17. Even when taken in the light most favorable to the Plaintiff, there is no connection between Meegan's alleged actions and the adverse employment decision. Meegan's conduct occurred during the meeting in which Plaintiff was informed of his termination and suspension; the decision to terminate and suspend Plaintiff was made by Ms. Anderson, prior to the meeting. Meegan was a security guard and was not responsible for the decision to terminate and suspend Plaintiff. Plaintiff has not put forth any direct evidence of discrimination and therefore must proceed under the indirect method. See *Antonetti v. Abbott Laboratories*, 563 F.3d 587, 591 (7th Cir. 2009) ("A plaintiff may prove illegal discrimination either directly or indirectly.").

Because Plaintiff has failed to identify any evidence to support a claim under the direct method of proof, Plaintiff must proceed under the *McDonnell-Douglas* burden-shifting method. Under the *McDonnell Douglas* framework, a plaintiff must present evidence tending to show that: (1) he is a member of a protected class; (2) he performed reasonably on the job in accord with his employer's reasonable expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside of his protected class were treated more favorably. 411 U.S. 792, 802-04 (1973); see also *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006).

Plaintiff's Title VII sex discrimination claim fails because he did not present evidence that he performed reasonably at Youth Communication or that similarly situated employees were

treated more favorably. First, Plaintiff never puts forth evidence that he performed in accord with Youth Communication's reasonable expectations. Although Plaintiff's account of the altercation differs with the College's description of events, it is undisputed that Plaintiff was involved in some sort of altercation at the Youth Communication office. Three different Youth Communication employees witnessed the fight (Samori Wood, Phil Costello, and Kevin Sparrow) and gave remarkably similar descriptions of what occurred, most notably Plaintiff physically pulling Bush's hair.

Plaintiff maintains that he did not grab Bush by the hair and that, as a result of this differing opinion, a disputed fact exists that precludes summary judgment. Even if the exact details are in dispute, Plaintiff does not dispute that he made physical contact with Bush and in fact stated in his deposition that he "pushed [Bush] up off of [him]." Sawyer Dep., 75:10-24. Prior to making her decision to terminate and suspend Plaintiff, Beverly Anderson had the testimony of three individuals who all stated that there was an inappropriate verbal argument followed by a physical confrontation, which included Plaintiff pulling Bush's hair. Plaintiff also testified that there was a verbal altercation, that he pushed Bush, and that he "didn't know" whether or not he grabbed her hair or her wrist, shoulder, or chest. Both of them were terminated. Whether one was the aggressor, by words or actions, is of no moment; the Court's role is not to act as "super-personnel department that reexamines and reinvestigates employee disputes." *Hudson v. Wal-Mart Stores, Inc.*, 412 F.3d 781, 786 (7th Cir. 2005). Ms. Anderson reviewed the witness statements, which included a statement from Youth Communications' Executive Director and a statement from an eye witness (neither of whom have been shown to have a bias), prior to making her decision. Her investigation led her to believe that Plaintiff was

not meeting legitimate expectations, and Plaintiff has not come forward with sufficient evidence to rebut this finding.

Although physical, workplace altercations are concerning in any context, they are particularly concerning when they occur in a workplace like Youth Communication, which exists to "provide guidance to high school age kids, i.e. role models for those kids to learn how to act and succeed in the world."  Even when taken in the light most favorable to Plaintiff, Plaintiff's involvement in a workplace altercation gave the College a sufficient reason to believe he was not meeting reasonable expectations.  See *Anders v. Waste Mgmt. of Wisconsin*, 463 F.3d 670 (7th Cir. 2006) (affirming summary judgment for employer on plaintiff's Title VII discrimination claim resulting from his termination for fighting in the work place); see also *Palmer v. Circuit Court of Cook County*, 117 F.3d 351, 352 (7th Cir. 1997) (affirming grant of summary judgment where plaintiff threatened co-worker).  Given Youth Communication's sensitive mission of providing mentorship to high school students, Plaintiff's undisputed involvement in the altercation, regardless of his role, prevented him from meeting the College's legitimate expectations.

Plaintiff claims that a "plaintiff in a termination case need not show, for *prima facie* case purposes, a similarly situated comparator."  Pl.'s Resp. at 6.  In support of this assertion, Plaintiff relies on *Pantoja v. American NTN Bearing* and asserts that he need only show that the employer sought someone else to do the plaintiff's work after the termination.  495 F.3d 840, 846 (7th Cir. 2007) ("Once an employee can show (in the sense of raising an issue of material fact at the summary judgment stage) that *he is meeting his employer's legitimate expectations* (the second element), then the fact that the employer needs to find another person to perform that job after the employee is gone raises the same inference of discrimination that the continuation of a search

does in the hiring situation.") (emphasis added). There are two problems with Plaintiff's argument. First, nothing in the record indicates that Youth Communication did in fact seek someone else to do Plaintiff's work. Second, the *Pantoja* carve-out only applies when the plaintiff can show that he was meeting his employer's legitimate expectations, which Plaintiff has failed to do.

Plaintiff also claims that "the legitimate expectations formulation is not appropriate here." Pl.'s Resp. at 7. In support of this position, Plaintiff relies on cases that hold that the legitimate expectations prong is not appropriate if the expectations themselves are applied in a discriminatory manner. However, Plaintiff cannot argue that Beverly Anderson applied employment standards in a particularly strict manner due to Plaintiff's sex because Bush, a female, also was terminated. The sole reason for Plaintiff's termination from Youth Communication was his history of physical altercations with fellow students, and Plaintiff fails to offer any evidence that the investigation of the fight was conducted in a discriminatory manner.

Further, Plaintiff fails to show that similarly situated employees outside of his protected class were treated differently. *Rogers v. City of Chicago*, 320 F.3d 748, 754 (7th Cir. 2003) ("A similarly situated employee is one who is directly comparable to [the plaintiff] in all material respects.") (internal quotation omitted). Plaintiff has not identified another employee who engaged in similar conduct and was not terminated. The altercation only involved one other individual, Bush, who is an African-American female. Bush also was terminated from her position at Youth Communication as a result of the fight. Courts in this circuit have routinely declined to probe the actual details of work place altercations when all of the involved parties were terminated. See *Hudson v. Wal-Mart Stores, Inc.*, 412 F.3d 781 (7th Cir. 2005) (affirming

summary judgment for employer on state law retaliation claims emanating from fight in which both employees were to be terminated); see also *Maclin v. A.M. Bus Co., Inc.*, 2006 WL 463370 (N.D. Ill. Feb. 22, 2006) (granting summary judgment for employer on Title VII claims emanating from work place fight in which both participants were terminated). To the extent that Plaintiff argues that he was disciplined more harshly than Bush,[4] the Court notes that the two are not similarly situated, as Bush did not have two additional infractions in her file.

In short, because Plaintiff has failed to establish a *prima facie* case, no rebuttable inference of discrimination arises and the burden has not shifted.[5] Further, Defendant has articulated a legitimate, non-discriminatory reason for Plaintiff's termination, namely his involvement in a work place altercation. Plaintiff fails to meet the high standard of showing that Defendant's reason for terminating Plaintiff was motivated by a discriminatory reason. See *Alexander v. Wis. Dep't of Helath & Family Servs.*, 263 F.3d 673, 682 (7th Cir. 2001). As a result of Plaintiff's inability to establish a *prima facie* case through the indirect or direct methods of proof, and his inability to show pretext, the Court grants summary judgment in favor of the College on Plaintiff's Title VII sex discrimination claim.

### B.     Title VI Race Discrimination Claim

Title VI provides that "[n]o person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

---

[4]  Although Plaintiff fails to make this argument in his brief, the Court briefly addresses its futility.

[5]  If the plaintiff successfully establishes a *prima facie* case, a rebuttable inference of discrimination arises, and the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. See *Essex v. United Parcel Serv. Inc.*, 111 F.3d 1304, 1308 (7th Cir. 1997); see also *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007). Once the defendant provides a legitimate explanation, the burden then shifts back to the plaintiff to prove that the proffered justification is pretext. *Fane*, 480 F.3d at 538.

42 U.S.C. § 2000d; *Brewer v. Bd. of Trs.*, 479 F.3d 908, 921 (7th Cir. 2007). The Court applies the same burden shifting framework governing liability under Title VII to claims for discrimination under Title VI, including the same methods of direct and indirect proof. *Paul v. Theda Medical Ctr., Inc.,* 465 F.3d 790, 794 (7th Cir. 2006); *Fuller v. Rayburn,* 161 F.3d 516, 518 (8th Cir. 1998). In order to establish a *prima facie* case of Title VI discrimination, Plaintiff must show that: (1) he is a member of a protected class; (2) he was meeting the College's legitimate educational expectations at the time of his suspension; (3) he suffered an adverse educational action; and (4) similarly situated students outside of his protected class were treated more favorably. *Brewer*, 479 F.3d at 921; *Byrant v. Independent Sch. Dist. No. I-38 of Garvin County, OK*, 334 F.3d 928, 930 (10th Cir. 2003); *Hankins v. Temple Univ. (Health Sciences Ctr.)*, 829 F.2d 437, 440-43 (3d Cir. 1987).

Plaintiff claims that the College discriminated against him because of his race in violation of Title VI when it suspended him for one year as a result of the June 23, 2008 incident. In his response brief, the only evidence of alleged discrimination cited by Plaintiff is a comment made by his instructor, Colleen Flanigan, that "you people need to learn how to turn your work in on time," her subsequent refusal to accept a late assignment, and a claim that he received an unwarranted low grade for the class.

Fatal to Plaintiff's claim is the lack of a connection between Ms. Flanigan and his suspension. Plaintiff has not presented any facts indicating that Flanigan was involved in the decision to terminate or suspend Plaintiff. See *Paul v. Theda Med. Ctr., Inc.*, 465 F.3d 790, 795 (7th Cir. 2006) ("In another attempt to show pretext, Dr. Paul claims that in 1994 or 1995 a patient told him that a Theda Clark physician, since retired, told the patient that 'Dr. Paul should go back from [where] he has come from, he should take his camel back there.' There is no

evidence that this retired doctor was involved in or at all influenced Theda Clark's decision to deny Dr. Paul active staff membership. The statement is irrelevant."); see also *Rozskowiak v. Village of Arlington Heights*, 415 F.3d 608, 611-13 (7th Cir. 2005) (concluding that plaintiff's supervisor's comment that plaintiff "would probably be losing [his] job because [he] was a stupid Polack," was unrelated to the plaintiff's termination, and the plaintiff was terminated for legitimate, job-related reasons). Furthermore, there is nothing in this particular statement that evinces *racial* discrimination. Plaintiff believed that Flanigan's comment was discriminatory, but looking at the comment objectively, there is no way to know whether the comment was directed at a particular race or gender, or simply at her students in general. Plaintiff also has failed to present any other comments by Flanigan that would cast this particular comment in a discriminatory light.

Plaintiff also has not demonstrated that he was meeting the College's legitimate educational expectations. As set forth in addressing Plaintiff's Title VII employment discrimination claim, Plaintiff was involved in an altercation as part of his employment with Youth Communication, a work-study program that was affiliated with the College.[6] Standing alone, the incident is sufficient to establish that Plaintiff was not meeting the College's legitimate educational expectations at the time of his suspension, but there is the additional wrinkle of the July 2008 incident being Plaintiff's third documented physical altercation during his affiliation with the College. As set forth previously in analyzing Plaintiff's sex discrimination claim, Plaintiff had a documented history of altercations with other students in his file. Ms. Anderson reviewed these two incidents as part of her investigation into the June 23, 2008 incident. Each of the reports was made by different individuals affiliated with the university, and each report involved Plaintiff having, at a minimum, a heated disagreement with a fellow student. These

---

[6] Defendant is considered the employer for the purposes of the agreement with Youth Communication.

three incidents suffice to show that Plaintiff was not meeting the College's legitimate educational expectations at the time of his suspension, and Plaintiff has not put forth any evidence (by way of his grades, teacher recommendations, or the like) demonstrating that he was meeting the College's expectations.

Moreover, Plaintiff has not shown that similarly situated students outside of his protected class were treated more favorably. Plaintiff's Title VI claim is based on race discrimination and, as an African-American, Plaintiff is a member of a protected class. Ginger Bush and Iona Benjamin, the only other students to which Plaintiff compares himself, also are African-American students and members of the same protected class.

In addition to Plaintiff's failure to make out a prima facie case of either race or gender discrimination or retaliation for his complaint of discrimination, there simply is nothing in the record that would support a finding that Defendant's stated reason for suspending Plaintiff was a fabrication. As was the case with his Title VII claim, Plaintiff attempts to show that the College's proffered reason for his suspension, the June 23, 2008 altercation, is mere pretext for its true discriminatory intent. In so doing, Plaintiff relies again on Colleen Flanigan's comment. And, as previously set forth, the lack of a connection between Flanigan's alleged comment and the adverse educational decision is fatal to his claim. Plaintiff's involvement in the June 23, 2008 altercation was more than enough reason for the College to suspend him. Further, not only was Flanigan not the decision maker, but there is nothing in the record to indicate that Anderson's decision was based on anything other than the June 23, 2008 altercation and his documented history of physical altercations with fellow students. Plaintiff has not provided any evidence (other than his subjective beliefs during his deposition that "race" or "gender" figured into the equation) that the decision to suspend him was motivated by his race or gender or

otherwise demonstrated that his race and gender were factors in the decision to suspend him. There simply is no evidence from which a reasonable person could find that Defendant suspended Plaintiff because of his sex or race. Accordingly, the Court grants summary judgment in favor of Defendant on Plaintiff's Title VI race discrimination claim.

### C. Title VI Retaliation Claim

Plaintiff claims that he was suspended from the College in retaliation for submitting a complaint alleging race discrimination against his instructor, Colleen Flanigan. Title VI provides that no person "shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Although the statute does not expressly prohibit retaliation, Title VI's implementing regulations provide that no recipient of federal funding "shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by [Title VI] * * * because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under [Title VI]." 34 C.F.R. § 100.7(e). In *Jackson v. Birmingham Board of Education*, the Supreme Court held that Title IX's private right of action encompasses claims of retaliation against an individual and, in light of that decision, Defendant concedes that there likely is a cause of action for retaliation under Title VI. 544 U.S. 167 (2005).

Like Title VII retaliation claims, Title VI retaliation claims may be established through either direct evidence or the burden shifting indirect method set forth in *McDonnell Douglas*. Under the direct method, in order to demonstrate a causal link between a termination and the filing of a charge of discrimination, a plaintiff must demonstrate that the employer would not have taken any adverse action "but for" the protected expression. *Johnson v. University of*

*Wisconsin-Eau Claire*, 70 F.3d 469, 479 (7th Cir. 1995); see also *Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir. 2003) ("To make a claim for Title VI retaliation, Peters must show (1) that she engaged in protected activity; (2) that Appellees took a material adverse employment action against her, and (3) that a causal connection existed between the protected activity and the adverse action."). A plaintiff's uncorroborated deposition testimony is almost always insufficient to demonstrate a causal link. *Sylvester v. SOS Children's Vills Ill., Inc.*, 453 F.3d 900, 902 (7th Cir. 2006). Under the indirect method of establishing a causal connection, a plaintiff must present evidence that he met the employer legitimate expectations, that he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity, and that any nondiscriminatory reasons offered by the employer for the adverse action are pretextual. See *O'Neal v. City of Chicago*, 588 F.3d 406, 410 (7th Cir. 2009); see also *Tomanovich,* 457 F.3d at 666; *Stone v. City of Indianapolis Pub. Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002).[7] Then, if the employer presents evidence of a non-discriminatory reason for its employment action, the burden shifts back to the plaintiff to demonstrate that the employer's reason is pre-textual. *Id.*

Plaintiff maintains that he engaged in a statutorily protected activity when he complained about his Introduction to Marketing grade to J. Dennis Rich, one of the College's administrators. On June 18, 2008, Plaintiff e-mailed Rich to complain about his grade. On June 18, 2008, Rich responded to Plaintiff's e-mail and advised him of the steps he needed to take to appeal his grade, which were also outlined in the student handbook. On June 20, 2008, Plaintiff e-mailed Rich again and alleged that he was not given the same opportunities as other students because he was the only African-American in the class. Rich responded to Plaintiff on June 20, 2008,

---

[7] Given that the Title VII *McDonnell Douglas* test is being imputed into the Title VI claim in the instant case, the "employer" is the Defendant, Columbia College, an educational institution. See *Peters v. Jenney*, 327 F.3d 307, 321 n. 15 (4th Cir. 2003).

advised him of the steps he needed to take to follow through on his claim and asked him to document all instances of racial discrimination that may have occurred in the class. Rich also asked Plaintiff to send him his coursework from the Introduction to Marketing class for Rich's review. On June 21, 2008, Plaintiff replied, but did not provide the information Rich requested; rather, Plaintiff requested a meeting to discuss the matter in person. Plaintiff engaged in a back and forth e-mail exchange with Rich over the next couple of days, but neglected to provide Rich with documented instances of racial discrimination. Then, on June 23, 2008, in the midst of his grade appeal, Plaintiff was involved in the physical altercation with Student A.

Plaintiff has failed to demonstrate that the College would not have taken any adverse action "but for" his protected expression. *Johnson v. University of Wisconsin-Eau Claire*, 70 F.3d 469, 479 (7th Cir. 1995). Plaintiff has not carried that burden nor has Plaintiff indicated that Anderson, the decision-maker with respect to Plaintiff's suspension, even knew about his discrimination complaint. There is no evidence in the record that Plaintiff provided the requested documentation to Rich or that Rich was ever apprised of the specific interactions between Plaintiff and Flanigan that were discussed in Plaintiff's deposition, let alone evidence that Anderson knew about the discrimination claim.

Conversely, the College has presented ample evidence that Plaintiff was suspended for engaging in physical altercations with other students. Anderson's affidavit indicates that the only information she reviewed as part of her investigation into the June 23, 2008 altercation were e-mails and witness accounts of the Youth Communications incident and the previous incidents in New Orleans and the Hokin Gallery. The fact that Plaintiff made his discrimination complaint in close proximity to his eventual suspension is not enough; the Seventh Circuit has held that "mere temporal proximity between the filing of the charge of discrimination and the action

alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue." *Szymanski v. County of Cook*, 72 Fed. Appx. 451 (7th Cir. 2003). Furthermore, here, there was a clear intervening factor—his fight with Student A—between the time that Plaintiff complained to Rich and the time that he was suspended. It is Plaintiff's burden to demonstrate a connection between the adverse action and the protected activity, and Plaintiff has failed to put forth even a scintilla of evidence that Anderson was aware of his grade and discrimination complaint, while there is sufficient evidence that Plaintiff failed to meet the College's legitimate expectations. See *Anders,* 463 F.3d 670 (affirming summary judgment for employer on plaintiff's Title VII discrimination claim resulting from his termination for fighting in the work place); see also *Palmer*, 117 F.3d 351 (affirming grant of summary judgment where plaintiff threatened co-worker).

Finally, with respect to the indirect method, in addition to the fact that Plaintiff was not meeting the College's legitimate expectations, Plaintiff failed to identify a similarly situated individual outside the protected class who was treated more favorably than he was, which is required to prove his claims using the indirect method. Instead of identifying a similarly situated employee, Plaintiff argues that a question of fact exists regarding "if"—that is to say, whether—other students were subject to the same standards as Plaintiff. At the summary judgment stage, it is Plaintiff's responsibility to offer evidence to support his causes of action. Plaintiff cannot avoid summary judgment by suggesting that a question of fact may exist and positing that evidence may support his claims. Rather, as the non-moving party, Plaintiff must present "evidence upon which the jury could find for [him]." *Anderson v. Libby Lobby, Inc.,* 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); see *Smith v. Severn,* 129 F.3d 419, 427 (7th

Cir.1997) ("[A] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion.").  He has failed to do so.

At a minimum, Plaintiff was suspended for his inability to stay out of altercations with fellow students.  The decision to suspend Plaintiff was made by Ms. Anderson, an African-American woman.  The fact that Plaintiff lodged one complaint against one teacher after he received a low grade does not mean that the College retaliated against him.  Instead, based on the record, it is readily apparent that the College did not find Plaintiff's behavior toward other students acceptable.  The College was entitled to this view, and the evidence presented by Plaintiff does not come close to painting a different picture.

## IV.     Conclusion

For these reasons, the Court grants Columbia College's motion for summary judgment [61].[8]

Dated:  March 19, 2012                    _____
                                          Robert M. Dow, Jr.
                                          United States District Judge

---

[8]  Defendant has asked for an award of costs.  "Costs * * * shall be allowed as of course to the prevailing party unless the court otherwise directs."  Fed. R. Civ. P. 54(d).  Recoverable costs, as set forth in 28 U.S.C § 1920, include: (1) fees of the clerk, (2) fees for transcripts, (3) fees for printing and witnesses, (4) fees for copies of papers necessarily obtained for use in the case, (5) docket fees, and (6) compensation of court-appointed experts and interpreters.  *Tumas v. Bd. of Educ. of Lyons Twp. High Sch. Dist. No. 204*, 06 C 1943, 2008 WL 611601 (N.D. Ill. Feb. 29, 2008).  There is a strong presumption favoring the award of costs to the prevailing party. *Weeks v. Samsung Heavy Indus., Co.*, 126 F.3d 926, 945 (7th Cir. 1997).  If Defendant believes costs are warranted, Defendant may file a timely bill of costs that complies with the rules governing costs.